# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JEFFREY MOLITOR, LAURA C. DE LA CABADA, STEVE CLARKE, and RUTH MAKI, individually and on behalf of all others similarly situated, | Case No. 1:16-cv-02106 |
| | Honorable Charles R. Norgle, Sr. |
| *Plaintiffs,* | |
| v. | |
| MANASSEH JORDAN MINISTRIES, INC., a New York Religious Corporation, and YAKIM MANASSEH JORDAN, an individual, | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jeffrey Molitor, Laura C. De la Cabada, Steve Clarke, and Ruth Maki (collectively, "Plaintiffs") bring this First Amended Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants Manasseh Jordan Ministries, Inc. ("MJM") and Yakim Manasseh Jordan ("Manasseh" and, together with MJM, "Defendants") to put a stop to the incessant and abusive spam robocalling practices they have perpetrated for years, *ad nauseum*, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"). Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.      Despite thousands of consumer complaints, an FCC citation, and multiple news articles decrying their practice, the Jordan family continues to place unsolicited robocalls to

cellular telephones nationwide, by the thousands, in ways that routinely collect money from those most in need.

2.      By all accounts, these robocalls are extremely profitable. Defendant Manasseh Jordan, a 25-year-old self-identified "prophet,"[1] lives a lavish lifestyle that includes multi-million dollar homes and Rolls Royce cars. These expenditures are largely funded through "seed-faith" money donated to his "nonprofit" corporation, MJM, and/or his father's corporation, Zoe Ministries, Inc. ("ZMI"). As will be made clear through this Complaint and subsequent discovery, Manasseh and his father partner to use MJM and ZMI as sham corporations and alter-egos so that they can commit willful torts for their own personal gain, all in abuse of the Religious Corporation structure set forth by the State of New York.

3.      Defendants use robocalling to constantly find new donors and generate new lines of revenue. Despite agreeing to no fewer than nine *individual* TCPA settlements over the past three years,[2] Defendants still finds it worthwhile to continue using Manasseh's voice to make

---

[1]      Manasseh Jordan Ministries, *About the Prophet*, http://prophetmanasseh.com/aboutprophet (last accessed Sept. 28, 2015).

[2]      At the time of filing Plaintiff Molitor's original complaint, this was at least the seventh TCPA lawsuit filed this year (and the fourteenth since 2012) complaining of robocalls that feature the prerecorded voice of Defendant Manasseh. All but one—an individual suit—have settled individually or have otherwise ended. *See Bankosz v. Manasseh Jordan Ministries et al.*, 6:15-cv-01182 (M.D. Fla. July 22, 2015); *Carter v. Manasseh Jordan Ministries*, 2:15-cv-14237 (S.D. Fla. June 30, 2015); *Cotto v. Manasseh Jordan Ministries et al.*, 6:15-cv-00741 (M.D. Fla. May 8, 2015); *Robles v. Manasseh Jordan Ministries et al.*, 8:15-cv-00789 (M.D. Fla. April 2, 2015), *Bundrage v. Jordan et al.*, 8:15-cv-00618 (M.D. Fla. March 20, 2015), *Linlor v. Manasseh Jordan Ministries*, 3:15-cv-00032 (S.D. Cal. Jan. 7, 2015); *Rice v. Manasseh Jordan Ministries*, 8:14-cv-02921 (M.D. Fla. Nov. 21, 2014); *Friedman v. The Prophet Manasseh Jordan Ministries*, 1:14-cv-03129 (S.D.N.Y. May 2, 2014); *Lemberg v. Manasseh Jordan Ministries*, 3:14-cv-00240 (D. Conn. Feb. 26, 2014); *Romack, et al. v. Yakim Manasseh Jordan, et al.*, 3:13-cv-02484 (N.D. Ohio Nov. 8, 2013); *Bontrager v. The Prophet Manasseh Jordan*, 2:13-cv-01853 (E.D. Cal. Sept. 6, 2013); *Ferguson v. The Prophet Manasseh Jordan Ministries*, 5:13-cv-02463 (N.D. Cal. May 31, 2013); *Alexander et al v. The Prophet Manasseh Jordan*

prerecorded calls. Defendant Manasseh uses his alter ego, MJM, to knowingly break the law and repeatedly violate the TCPA, all to increase his personal wealth at the expense of non-consenting consumers.

4.      Indeed, Manasseh, MJM, and/or their agents regularly place robocalls, *en masse*, to the cellphone numbers of people who simply do not want them and never requested them. One newspaper article from February of 2015 states:

> "I have heard from a person who considers me his dearest friend. He has told me so more than 100 times, even though I've never met him. His name is Manasseh Jordan, and he calls himself Prophet Manasseh. He calls me frequently because he is so concerned about me. He especially is worried about my finances and says he has special messages for me from God. . . .
>
> One thing I'm certain about: I'm not the only one being harassed by these calls. I Googled 'Prophet Manasseh phone calls' and found sites filled with complaints by people who have tried to stop this harassment. . . .
>
> In the end, the only way to stop these calls may be to have my number changed. It shouldn't have to come to that."[3]

5.      Like thousands of others, Plaintiffs have long been subject to Defendants' abusive and incessant robocalling practices. And, like thousands of others, Plaintiffs never invited Defendants to call. Nonetheless, Defendants regularly robocall his cellular telephone number, without his consent, and despite his attempts to stop and block their calls.

6.      By making the telephone calls at issue in this Complaint, Defendants caused

---

*Ministries*, 3:12-cv-02584 (S.D. Cal. Oct. 23, 2012). Nevertheless, Defendants' calls continue and Plaintiffs now bring the instant class action to conserve judicial resources and increase efficiency.

[3]      Deitz, Harry. *Do Not Call List Does Not Work For Manasseh's Dearest Friend*. The Reading Eagle (Feb. 15, 2015) (available at http://www.readingeagle.com/news/article/harry-deitz-do-not-call-list-does-not-work-for-manassehs-dearest-friend) (last accessed Sept. 28, 2015).

Plaintiffs and the members of a putative Class of consumers (defined below) actual harm, including the aggravation, nuisance, wasted time, and invasion of privacy that necessarily accompanies the receipt of unsolicited and harassing telephone calls, as well as the monies paid to their carriers for the receipt of such telephone calls.

7.      The TCPA was enacted to protect consumers from unsolicited telephone calls exactly like those alleged in this case. In response to Defendants' unlawful conduct, Plaintiffs file the instant lawsuit and seek an injunction requiring Defendants to cease all unsolicited telephone calling activities to consumers and an award of statutory damages to the members of the Class under the TCPA, together with costs and reasonable attorneys' fees.

### PARTIES

8.      Plaintiff Jeffrey Molitor is a natural person and citizen of the State of Illinois and resident of Cook County.

9.      Plaintiff Laura C. De la Cabada is natural person and citizen of the State of New York residing in New York City.

10.     Plaintiff Steve Clarke is a natural person and citizen of the State of California residing in Grand Terrace.

11.     Plaintiff Ruth Maki is a natural person and citizen of the State of California residing in San Marcos.

12.     Defendant Yakim Manasseh Jordan is a natural person and a citizen of the United States. He has been associated with several residential properties at addresses in various states, including New York, Florida, Massachusetts, and New Jersey. He regularly travels through the United States to perform speaking arrangements and he regularly transacts business with and solicits payments from the citizens of Illinois, both in person and through robocalls. He has

personally appeared in Cook County, Illinois, to hold a "Prophetic Service" as recently as June 28, 2015. He owns, directs, or otherwise controls Manasseh Jordan Ministries, Inc.

13.     Defendant Manasseh Jordan Ministries, Inc. ("MJM"), is a New York Religious Corporation located at 310 Riverside Drive, New York, New York 10025. MJM shares its address with Zoe Ministries, Inc., a nonprofit that is owned, directed, or otherwise controlled by Manasseh's father, E. Bernard Jordan. MJM sponsored a "Prophetic Service" in Cook County, Illinois, as recently as June 28, 2015, and conducts business and solicits payments throughout Cook County, the State of Illinois, and the United States.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, which is a federal statute.

15.     This Court has personal jurisdiction over Defendants and venue in this District is proper under 28 U.S.C. § 1391(b) because Defendants transact business within this District, perform in-person services in this District, solicit a significant amount of payments from within this District, and because some of the wrongful conduct giving rise to this case was directed to and caused injury in this District. Additionally, Plaintiff Molitor, an individual, is a resident of this District.

## COMMON FACTUAL ALLEGATIONS

**I.      MJM Incorporates Just After the FCC Cites ZMI for Robocalling.**

16.     ZMI is a "nonprofit" organization owned, directed, or otherwise controlled by Defendant Manasseh's father, E. Bernard Jordan ("Jordan").

17.     ZMI and Jordan pioneered the profitable prosperity pitch later adopted by Manasseh and MJM. As the Times Herald-Record once wrote, "[o]ver the years, preaching a

gospel of prosperity and self-empowerment, Jordan built Zoe Ministries into a multimedia enterprise that collected $2.8 million from its loyal following in 2001. 'We live to give,' Jordan teaches his followers to say. And give they do." [4]

18.     "Jordan makes no apologies for his mansion and fleet of cars, which includes a Rolls-Royce and a Mercedes-Benz SUV." *Id.* Indeed, through nonprofit funds, Jordan once commissioned a team of Russian artists to paint, over the course of "two to three years," elaborate murals of himself throughout his "27-room mansion," including "Jordan on a throne, as pharaoh," "Jordan as Jesus in the familiar iconography of medieval and Renaissance art," and, "in a room with scarlet walls and gilded filigree on top . . . Jordan on a throne, as God." *Id.*

19.     To maintain this lavish lifestyle, Jordan started reaching beyond the pockets of his immediate following. Specifically, he started using robocalls, *en masse*, to barge into the living rooms of consumers nationwide and seek fresh lines of revenues. Naturally, consumers complained:

> "We would get a phone call for each one of us, one right after the other. Way too annoying! I asked through email to be removed off there [*sic*] emailing list, calling list and mail list in [*sic*] behalf of my son (13yrs. old), my husband and myself. . . . So far nothing has worked for me. I emailed them repeatedly to remove me and to knock it off, I have sent back all mail (return to sender/no longer lives here) and tried calling with no solution. All the numbers they list are for you to give money or what they call seed. They are driving me crazy. I don't know what else to do. I just want them to leave me alone." [5]

---

[4]     McKenna, Chris. *The Prophet of Profit Sows the Seeds of Wealth*. Times Herald-Record (Sept. 14, 2003) (available at http://www.recordonline.com/article/20030914/news/309149999) (last accessed Sept. 28, 2015).

[5]     Ripoff Report, *Report Against Zoe Ministries and Bishop E. Bernard Jordan*, http://www.ripoffreport.com/r/Zoe-Ministries-Bishop-Jordan-Bishop-E-Bernard-Jordan-E-Bernard-Jordan/New-York-New-York/Zoe-Ministries-Bishop-Jordan-Bishop-E-Bernard-Jordan-Email-Spam-Spamers-Repeated-T-235642 (last accessed Sept. 28, 2015).

20.     As a result of consumer complaints, the Federal Communications Commission ("FCC") issued a citation letter to ZMI and Jordan for "prerecorded and autodialed call message violations."[6] It noted that "[i]f, after receipt of this citation, you or your company violates the Communications Act or the Commission's rules in any manner described herein, the Commission may impose monetary forfeitures not to exceed $16,000 for each such violation or each day of a continuing violation." *Id*.

21.     With such a daunting threat looming, Jordan turned to his family to provide an alternative solution. As a result, within two months of the FCC citation, three of Jordan's children (including Manasseh), along with ZMI Prophet Charlie Berrian (a close family friend), incorporated MJM, which was then used as a replacement robocalling vehicle.[7]

22.     This newly-incorporated entity overlapped substantially with ZMI. It assumed the same operating address (310 Riverside Drive, New York, New York 10025). Its trustees—all Jordan family members or close friends—were all actively involved with ZMI, with at least one using the same "@zoeministries.com" email address while doing business for MJM. At least one MJM trustee listed a ZMI-owned mansion as a home address. And of course, both MJM and ZMI enjoyed the same "non-profit" status, with MJM's Articles of Incorporation specifically stating that "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services

---

[6]     *See* FCC Citation, attached as Exhibit A.

[7]     *See* Articles of Incorporation, attached as Exhibit B.

rendered . . . ." *Id.*

23.     Most problematic for consumers, the new entity took over the same robocalling practices of ZMI, offering prerecorded prayers, prophesies, and miracles-for-hire, over the phone and outside the immediate scrutiny of the FCC.

24.     As such, and on information and belief, MJM and ZMI are alter-egos of each other and act as a single business entity, with one committing TCPA torts and the other sheltering the assets received from such torts. Moreover, this single entity exists to enable the partnership of Manasseh and Jordan to enrich itself through self-dealing and purposeful tortious conduct, and thus perverts the privilege of doing business in a corporate form. Indeed, Manasseh largely exercises his domination over MJM to place the same types of robocalls ZMI previously placed, all to profit while avoiding compliance with the TCPA and potential liability from ZMI's FCC citation. Additionally, on information and belief, both MJM and ZMI intermingle and manipulate assets, such that their assets concentrate under ZMI, Manasseh, and Jordan while their TCPA tort liabilities concentrate under MJM. This leaves MJM undercapitalized for the TCPA liabilities it purposefully accrues. As such, MJM generates proceeds through illegal robocalling while attempting to artificially limit the recovery available to the thousands of innocent consumers who never consented to interact with MJM and who are repeatedly harmed by its tortious conduct. Consequently, and as a direct result of Manasseh's wrongful domination of MJM, Manasseh is enriched while consumers are harmed.

25.     Further, on information and belief, both MJM and ZMI have non-functioning trustees that allow Manasseh and Jordan, as partners, to siphon off corporate assets for their own personal use, at will. The entities have failed to maintain arm's length relationships with their executives, as MJM and ZMI provide Manasseh and Jordan with salaries and perquisites that far

exceed the reasonable market value of services legally provided. This directly contravenes the non-profit purposes for which such entities were purportedly created and reflects self-dealing as opposed to honest and disinterested transacting. Indeed, Manasseh and Jordan treat the assets of MJM and ZMI as their own personal assets, living in the homes[8] and driving the cars[9] provided to them directly (or indirectly through excessive salaries) by such entities.

## II. Prophet Manasseh and MJM Continue Selling Prerecorded Prosperity, Making Robocalls to Cellphone Numbers.

26.     Manasseh himself claims to be a prophet of the Prophetic Order of Mar Elijah ("P.O.M.E."), another organization created and overseen by his father, "Master Prophet" E. Bernard Jordan.[10] Manasseh has appeared several times on religiously-themed television programs, including some shows hosted by his father and others by televangelist Benny Hinn, to

---

[8]     For instance, homes associated with the 25-year-old Defendant Manasseh include a nine-bedroom mansion in Tuxedo, New York; a six-bedroom mansion in North Miami Beach, Florida; a Ritz Carlton residential condominium in Boston, Massachusetts; a 12,000+ square foot house in Saddle River, New Jersey; and several beachfront condominiums in Sunny Isles Beach, Florida.

[9]     For instance, cars associated with the 25-year-old Defendant Manasseh include a 2014 Rolls Royce Wraith with an original MSRP in excess of $350,000; a 2012 Rolls Royce Ghost with an original MSRP in excess of $290,000; a 2010 Bentley Continental with an original MSRP in excess of $267,000; a 2009 Mercedes-Benz AMG with an original MSRP in excess of $130,000; and a 2004 Rolls-Royce Phantom with an original MSRP in excess of $320,000.

[10]     "Master Prophet E. Bernard Jordan is the overseer of the Company of Prophets and P.O.M.E." "[A]s you continue to worship God with your offerings up to $1000, you will be given the opportunity to have access to more advanced teaching materials and assignments and you move up to Level 3, becoming a Silver Member. . . . When you have completed a total of $3,000, you have moved up to Level 4, and you are now a Gold Member. You are just about there. . . . When you have planted your seeds totaling $5,000, you are eligible to attend the next Prophecology meeting where you will make sacred vows unto God in the presence of the Master Prophet and other P.O.M.E. members and be inducted into the Prophetic Order of Mar Elijah." *See* Prophecology, *Why P.O.M.E.?*, and *Are You Called?*, available at http://prophecology.com/theme/arialist/layout/why_pome.html and http://prophecology.com/are_ you_called.php (last accessed Sept. 28, 2015).

preach what is commonly known as the "prosperity gospel."[11] Specifically, Manasseh solicits millions of dollars from people in need, commonly known as "seed-faith," which he promises will purchase "favor" from God. *See, e.g.*, *False Prophet Manasseh Jordan Exposed*, at 2:46-3:21 (showing Manasseh telling viewers who "need God to change their season" to "sow a $52 seed for 52 weeks of favor.");[12] *see also* <u>Figures 1 and 2</u>, below (same); *cf.* <u>Figure 3</u>, below (showing Manasseh's father and business partner, Jordan, making the same request).


**Figure 1** (Manasseh, requesting $52 "seed").


**Figure 2** (same).



---

[11]    The ethics and merits of televangelism and the prosperity gospel are subjects of continuing public commentary. *See, e.g.*, *Last Week Tonight with John Oliver: Televangelists*, available at https://www.youtube.com/watch?v=7y1xJAVZxXg (published Aug. 16, 2015) (last accessed Sept. 28, 2015).

[12]    Available at https://www.youtube.com/watch?v=bSxEr5TXa1U. *See also id.* at 3:20-3:33 (stating "[y]ou need to walk into this abundance. I want you to get on the phone *right no*w. I want you to rush to it *right now*. I want you to move quickly to it *right now*. I want you to stop what you are doing. And I want you to give $52, $52, 52 weeks of favor")

**Figure 3** (E. Bernard Jordan, also requesting $52 "seed").

27.     The "prosperity gospel" inherently targets struggling socio-economic groups, including the unemployed, the under employed, the elderly, the disabled, and single mothers, among many others struggling to make ends meet—in other words, those most susceptible to (and in need of) the promises of good fortune made by Defendants.[13] To persuade these individuals to give him as much money as possible, Manasseh routinely manufactures stories that tie miracles to money payments, often indicating that the needy can trigger such miracles by giving their "best seed."

28.     For example, the day after voting to incorporate MJM, Manasseh appeared before a crowd and said:

> "**I'll never forget** that I was in **Texas** . . . and I looked at a woman, and she **sowed a seed of $1,000**. I said, . . . '**God tells me that he's touching Glenda**.' . . . . [They said] '**Glenda** died a couple hours ago.'. . . . [But then] the hospital called, and they said that 'Your mother, that died a couple hours ago, came back to life.' They said, to the **Johnson** family . . . that she heard a man calling her name. The prophet is able to speak to something dead, and bring life where death is."[14] [Emphasis added].

29.     A few months later, Manasseh told the same story to another crowd, simply inserting new first names and new dollar amounts:

> "**I'll never forget** I was in San Antonio, **Texas**, a couple came up, they **sowed $2,000**; . . . I said '**God is touching Kathy**.' . . . . [But

---

[13]     *See, e.g.*, *The Prophet of Profit*, *supra* <u>Note 6</u> (" 'You sow money, you're going to reap money,' explains [Manasseh's father], seated on a red velvet couch near the foyer of his three-story mansion.")

[14]     *Manasseh Jordan Lying Wonder*, https://www.youtube.com/watch?v=hKBISUwXoNc, at 0:43-2:22.

their pastor said] 'prophet, his mother's name is **Kathy** and was just declared dead a few hours ago.' . . . . [But then] they get a phone call through his doctor, the doctor says '**Mr. Johnson** . . . . Your momma **Kathy** just woke up and said she heard a man's voice. . . . [S]he heard a man call her name. . . .' When there is a prophetic anointing, anything that is dead must come back to life."[15] [Emphasis added].

30.    Not surprisingly, Manasseh uses the same money-for-miracles storytelling techniques in his prerecorded calls. For example, he has told thousands of call recipients, in his own prerecorded voice, "the Lord spoke to me personally about you. I must speak to you. I'm going to pass the phone to my blessed assistant and he's [going to] give you my blessed number so that you can call me back so that you can hear this blessed word."[16] That "blessed word," in turn, is a ten minute recording from Manasseh, implying, among other things, that people who pay him their "best seed" while facing foreclosure or living below poverty will get free-and-clear homes and million-dollar business contracts:

"What about the woman by the name of Evelyn, that was losing her home, her home was in foreclosure, she didn't know what to do, but she would get these phone calls, she would get these phone calls, and she began to prove God with her faith, and she would do her best seed, adding the change amount, and she got the call from CitiBank, and they said they forgave her for the loan, and that she owned the home free and clear. What about the lady that had a cleaning business that was living below poverty. . . . She would sow and sow week after week, and God released to her $1,300,000 worth of a commercial contract . . . . I want you now to step out and sow faith with your prosperity seed of $45 or $145 or your best seed of $20.45, the $345, the $545 seed, the $10.45 . . . . [W]atch [God] to begin to shower you with blessings, an anointing of prosperity will instantly begin to flow upon you . .

---

[15]    *Id*. at 2:50-5:49.

[16]    *See Do Not Call List Does Not Work*, *supra* Note 5.

12

..."[17]

31.     Unfortunately, Manasseh, through MJM, placed thousands of these prerecorded phone calls to the cellphones of consumers who did not consent to be called and who have *never* interacted with Defendants in any way whatsoever. This has lead to significant consumer backlash, as evidenced by legions of online complaints:[18]

- "He has been calling me since 10/2014 and he has 31 different #'s and has called at least 172 times. SO SICK OF IT!!"

- "I receive at least 1 to 2 calls a day from a automated service from a Prophet Manasseh, I have removed myself from the calling list that I never put myself on at least 50 times and still get the calls. I have blocked the number but they are still able to leave a very long annoying voicemail. I have also emailed them and left voicemails begging them to stop calling but it still continues. What do I have to do to make it stop."

- "You can't get off this call list. If you're on a mobile phone, you just need to continue to block the numbers every time this idiot calls. I'm up to 7 phone numbers blocked under his name. Prophet Manasseh Jordan Ministries."

- "I once got two calls in a two hour time period from two different states! I have been so frustrated by these calls, I actually got my phone # changed."

- "I have sent numerous messages and text messages as well saying stop please stop even threatened to call the authorities on the show called prophet Manasseh my phone and my children answer my phone and one day hear him going off on a rant it scares them to death and we respectively text messaged back the number he called me on and the guy just doesn't take no for an answer he calls and calls and calls."

---

[17]     This prerecorded message plays when calling the number (770) 728-6113 (last accessed Sept. 28, 2015).

[18]     These are just a small sampling of the approximately 600 online complaints placed on just one website concerning just one of the many Prophet Manasseh / MJM phone numbers. *See 800notes.com*, http://800notes.com/Phone.aspx/1-800-318-7853 (last visited June 20, 2016).

- "I too continue to get calls. This is a minutes phone and they have run down my [*sic*] drastically. To think I am paying for these calls!"

- "Five Hundred robo calls from five different numbers with the same Prophet Manassah recording in the past fifteen months. How does one stop this scammer?"

32.     Manasseh directly participates in these calls by recording his voice and by directing MJM, over which he exercises full domination and control, to transmit these voice recordings through automated telephone calls, all in knowing violation of the TCPA. Indeed, Manasseh has specifically admitted in court filings, concurrently with MJM, to having "sent prerecorded calls to people,"[19] and yet continues to have such calls placed on his behalf and for his personal enrichment.

33.     As such, Manasseh and MJM knowingly placed (and continue to place) prerecorded calls to cellphone numbers without the prior express consent of the call recipients. Likewise, they continue to do so after receiving requests to stop, including at least *thirteen* individual TCPA lawsuits. As such, Manasseh and MJM not only invaded the personal privacy of Plaintiffs and members of the putative Class, but also intentionally and repeatedly violated the TCPA.

### FACTS SPECIFIC TO PLAINTIFF MOLITOR

34.     Starting in May of 2015, Plaintiff Molitor began receiving robocalls on his cellular telephone number from Defendants, all of which feature the prerecorded voice of Defendant Manasseh.

35.     Plaintiff Molitor received more than 50 of these robocalls from, at a minimum,

---

[19]     See Answer of Defendants Manasseh Jordan Ministries and Yakim Manasseh Jordan to Class Action Complaint at ¶¶ 18-23, *Romack, et al. v. Yakim Manasseh Jordan, et al.*, 3:13-cv-02484 (N.D. Ohio Nov. 8, 2013).

the telephone numbers (203) 548-9311 and (203) 672-9236. *See* <u>Figure 4</u>, below (showing

specific call dates and times).

| Date | Time | Number |
|---|---|---|
| 5/5/15 | 5:46 PM | (203) 548-9311 |
| 5/12/15 | 6:45 PM | (203) 548-9311 |
| 5/16/15 | 2:25 PM | (203) 672-9236 |
| 5/20/15 | 2:06 PM | (203) 548-9311 |
| 5/23/15 | 8:17 PM | (203) 672-9236 |
| 5/27/15 | 11:54 AM | (203) 548-9311 |
| 5/29/15 | 3:08 PM | (203) 672-9236 |
| 6/4/15 | 1:59 PM | (203) 672-9236 |
| 6/5/15 | 4:34 PM | (203) 548-9311 |
| 6/9/15 | 2:09 PM | (203) 672-9236 |
| 6/12/15 | 6:32 PM | (203) 548-9311 |
| 6/16/15 | 4:11 PM | (203) 672-9236 |
| 7/3/15 | 5:13 PM | (203) 672-9236 |
| 7/7/15 | 2:05 PM | (203) 672-9236 |
| 7/10/15 | 5:54 PM | (203) 548-9311 |
| 7/15/15 | 2:14 PM | (203) 548-9311 |
| 7/17/15 | 2:03 PM | (203) 548-9311 |
| 7/19/15 | 6:13 PM | (203) 548-9311 |
| 7/21/15 | 5:04 PM | (203) 548-9311 |
| 7/24/15 | 5:53 PM | (203) 548-9311 |
| 7/26/15 | 2:09 PM | (203) 548-9311 |
| 7/27/15 | 5:28 PM | (203) 672-9236 |
| 7/29/15 | 3:25 PM | (203) 548-9311 |
| 7/31/15 | 3:47 PM | (203) 548-9311 |
| 8/2/15 | 8:18 PM | (203) 548-9311 |
| 8/3/15 | 4:53 PM | (203) 548-9311 |
| 8/4/15 | 3:10 PM | (203) 548-9311 |
| 8/7/15 | 5:35 PM | (203) 548-9311 |
| 8/8/15 | 1:51 PM | (203) 672-9236 |
| 8/10/15 | 3:43 PM | (203) 548-9311 |
| 8/11/15 | 2:09 PM | (203) 548-9311 |
| 8/12/15 | 2:17 PM | (203) 548-9311 |
| 8/14/15 | 6:40 PM | (203) 548-9311 |
| 8/16/15 | 8:55 PM | (203) 548-9311 |
| 8/17/15 | 2:28 PM | (203) 548-9311 |
| 8/18/15 | 1:59 PM | (203) 548-9311 |
| 8/19/15 | 1:58 PM | (203) 548-9311 |
| 8/21/15 | 4:26 PM | (203) 548-9311 |

| | | |
|---|---|---|
| 8/23/15 | 5:27 PM | (203) 548-9311 |
| 8/24/15 | 4:03 PM | (203) 548-9311 |
| 8/25/15 | 8:43 PM | (203) 548-9311 |
| 8/25/15 | 2:06 PM | (203) 548-9311 |
| 8/26/15 | 2:02 PM | (203) 548-9311 |
| 8/28/15 | 6:09 PM | (203) 548-9311 |
| 8/31/15 | 7:59 PM | (203) 548-9311 |
| 9/1/15 | 7:20 PM | (203) 548-9311 |
| 9/1/15 | 1:54 PM | (203) 548-9311 |
| 9/15/15 | 2:51 PM | (203) 548-9311 |
| 9/16/15 | 2:12 PM | (203) 548-9311 |
| 9/18/15 | 1:45 PM | (203) 548-9311 |
| 9/20/15 | 2:24 PM | (203) 548-9311 |
| 9/21/15 | 8:07 PM | (203) 548-9311 |
| 9/21/15 | 3:33 PM | (203) 548-9311 |
| 9/22/15 | 2:17 PM | (203) 548-9311 |
| 9/23/15 | 2:30 PM | (203) 548-9311 |
| 9/25/15 | 2:04 PM | (203) 548-9311 |
| 9/28/15 | 1:58 PM | (203) 548-9311 |
| 9/29/15 | 4:22 PM | (203) 672-9236 |
| 9/29/15 | 4:32 PM | (203) 548-9311 |

**Figure 4** (showing over 50 calls from May through September, 2015.)

36.     Plaintiff Molitor answered several of these calls and let others go to his voicemail. Each call featured a prerecorded message substantially similar to the other prosperity robocalls alleged throughout this Complaint, with instructions to call certain numbers back, including the number (678) 405-9374. When Plaintiff Molitor called this particular number in an attempt to stop the robocalls and get on an internal do-not-call list, he was met by one of Manasseh's ten-minute prerecorded prosperity pitches and was given no opportunity to opt-out.

37.     Plaintiff Molitor does not have a relationship with Manasseh or MJM, has never provided either of them with his telephone number or with consent to call, and has made attempts to get them to stop calling. They continue calling anyways.

38.     Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff Molitor and similar consumers who have never consented to receive

them.

## FACTS SPECIFIC TO PLAINTIFF DE LA CABADA

39.     For at least two years, Plaintiff De la Cabada has received robocalls on her cellular telephone from Defendants, all of which feature the prerecorded voice of Defendant Manasseh. Each prerecorded message was preceded by a pause before the recording began.

40.     Since September 2015 alone, Plaintiff De la Cabada has received more than 108 of these robocalls from, at a minimum, 20 distinct telephone numbers, including, *inter alia*: (704) 257-3531; (510) 275-1830; (800) 422-5590; (800) 203-0028; (213) 375-0371; (917) 728-1013;(800) 352-3407; (206) 209-1337; (917) 341-5318; (320) 207-9068; (917) 336-8793; (423) 794-2999; (917) 336-9082; (917) 391-0291; (917) 391-0695; (917) 391-0290; (480) 439-0194; (505) 359-6558; (917) 624-9877; (917) 391-0046; (917) 633-7378; and (917) 336-9146.

41.     Additionally, since September 2015, Defendants left 74 recorded messages on Plaintiff De la Cabada's cellular device. Plaintiff De la Cabada was able to block approximately 34 calls, but she received hundreds of additional calls prior to that time.

42.     Despite Plaintiff De la Cabada attempts to block Defendants calls, she has been unable to keep them from continuing to contact her. Specifically, when Plaintiff De la Cabada called in an attempt to get on an internal do-not-call list, she was met by one of Manasseh's ten-minute prerecorded prosperity pitches and was given no opportunity to opt-out. Even worse, Plaintiff De la Cabada was only able to reach a live person on one occasion, and when she was connected, that person feigned inability to hear her request to opt out of the calls.

43.     Plaintiff De la Cabada's young child has severe health complications, and she makes it her regular practice to answer phone calls even from unrecognized numbers to ensure her child's safety and welfare are intact. Her heart jumps every time her cellphone rings. As

such, Defendants' continuous and unrelenting calls are not only time consuming and distressing, they constitute harassment.

44. Plaintiff De la Cabada does not have a relationship with Manasseh or MJM, has never provided either of them with her telephone number or with consent to call, and has made every attempt to get them to stop calling. Nevertheless, Defendants continue calling anyways without regard to her requests that the calls cease. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff De la Cabada and similar consumers who have never consented to receive them.

### FACTS SPECIFIC TO PLAINTIFF CLARKE

45. Since December 7, 2015, Defendants made at least 14 calls to Plaintiff Clarke's cellular telephone using an autodialer and an artificial or prerecorded voice. Each pre-recorded message was preceded by a pause before the recording began.

46. For example, Defendants called Plaintiff Clarke's cellular telephone with a pre-recorded message every week over the course of at least seven weeks, even after he asked them to stop calling. The following chart shows several of the dates and times that Defendants called Mr. Clarke's cellular telephone number from their (800) 352-3407 number. *See* <u>Figure 5</u>, below (showing specific call dates and times).

| Date | Time | Number |
|---|---|---|
| 12/7/15 | 3:45 PM | (800) 352-3407 |
| 12/9/15 | 1:07 PM | (800) 352-3407 |
| 12/9/15 | 3:21 PM | (800) 352-3407 |
| 12/14/15 | 2:19 PM | (800) 352-3407 |
| 2/16/15 | 4:41 PM | (800) 352-3407 |
| 12/19/15 | 1:47 PM | (800) 352-3407 |
| 12/21/15 | 2:07 PM | (800) 352-3407 |
| 12/28/15 | 2:01 PM | (800) 352-3407 |

18

| 12/30/15 | 2:03 PM | (800) 352-3407 |
| 1/4/16 | 2:04 PM | (800) 352-3407 |
| 1/13/16 | 1:06 PM | (800) 352-3407 |
| 1/18/16 | 1:06 PM | (800) 352-3407 |
| 1/20/16 | 1:04 PM | (800) 352-3407 |
| 1/25/16 | 1:13 PM | (800) 352-3407 |

**Figure 5** (showing 14 calls from December through January 2016.)

47.     Defendants called Mr. Clarke at least 14 times using an autodialer and/or an artificial prerecorded voice without his prior express written consent.

48.     Plaintiff Clarke does not have a relationship with Manasseh or MJM, has never provided either of them with his telephone number or with consent to call, and has made every attempt to get them to stop calling. Nevertheless, they continue calling anyways without regard to his requests. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff Clarke and similar consumers who have never consented to receive them.

49.     In fact, on March 11, 2016, Plaintiff Clarke filed a complaint (that has since been voluntarily dismissed without prejudice) in the Southern District of New York in an attempt to get Defendants to cease making these calls.  *See Clarke, et al. v. Manasseh Jordan Ministries, Inc., et al.*, Civil Action No. 16-cv-01859.  Despite that filing, Defendants have continued to call Mr. Clarke with an autodialer and/or an artificial prerecorded voice as recently as June 9, 2016.

**FACTS SPECIFIC TO PLAINTIFF MAKI**

50.     Plaintiff Maki was similarly harassed by Defendants, receiving multiple calls with prerecorded messages for several weeks.  The following chart shows several of the dates and times that Defendants called Plaintiff Maki on her cellular telephone from their (800) 352-3407 number. *See* Figure 6, below (showing specific call dates and times).

19

| Date | Time | Number Calling |
|---|---|---|
| 12/7/15 | 3:40 PM | (800) 352-3407 |
| 12/7/15 | 3:40 PM | (800) 352-3407 |
| 12/9/15 | 1:08 PM | (800) 352-3407 |
| 12/14/15 | 2:14 PM | (800) 352-3407 |
| 12/16/15 | 4:44 PM | (800) 352-3407 |
| 12/21/15 | 2:04 PM | (800) 352-3407 |

**Figure 6** (showing 6 calls in December 2015.)

51.     Defendants called Plaintiff Maki on her cellular phone at least 6 times using an autodialer and an artificial or prerecorded voice, without her prior express written consent. Each prerecorded message was preceded by a pause before the recording began.

52.     Defendants' unsolicited robocalls are regularly placed, *en masse*, to thousands of cellular telephone numbers without the consent of the call recipients. As demonstrated above, on December 7, 2015, Plaintiff Clarke and Plaintiff Maki received robocalls from Defendants only 5 minutes apart.  On December 9, 2015, they received unsolicited robocalls only two minutes apart.

53.     Plaintiff Maki does not have a relationship with Manasseh or MJM, has never provided either of them with her telephone number or with consent to call, and has requested that they stop calling her by, among other things, filing a complaint in the Southern District of New York. *See Clarke*, *et al. v. Manasseh Jordan Ministries, Inc.*, *et al.*, Civil Action No. 16-cv-01859.  Defendants continue calling anyways without regard to her requests. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff Maki and similar consumers who have never consented to receive them.

## CLASS ALLEGATIONS

54.     **Class Definition**: Plaintiffs Molitor, De la Cabada, Clarke, and Maki bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of themselves and a class of

similarly situated individuals, defined as follows:

> All persons in the United States to whom: (1) Defendants or their agents placed a call; (2) using computerized dialing equipment and/or that featured a prerecorded voice; (3) to his or her cellular telephone number; and (4) where Defendants have no record of prior express consent from him or her to place such call.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

55.     **Numerosity**: The exact size of the Class is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendants made telephone calls to thousands of consumers who fall into the definition of the Class. Members of the Class can be easily identified through Defendants' records.

56.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

(a)     Whether Defendants' conduct violated the TCPA;

(b)     Whether Defendants systematically made telephone calls to consumers— including Plaintiffs and the Class—who did not previously provide Defendants and/or their agents with prior express consent to receive such telephone calls;

(c)    Whether Defendants systematically made telephone calls to consumers— including Plaintiffs and the Class—featuring prerecorded voices; and

(d)    Whether Plaintiffs and the members of the Class are entitled to treble damages based on the willfulness of Defendants' conduct.

57.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class, in that Plaintiffs and the members of the Class all sustained the same statutory injuries, aggravation, and invasion of privacy caused by Defendant's uniform wrongful conduct.

58.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in complex class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendants has no defenses unique to Plaintiffs.

59.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply to and affect each of the members of the Class uniformly, and Plaintiffs' challenge of those practices hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

60.    **Superiority**: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. In many cases, the damages suffered by the individual members of the Class are likely to have been small relative to

the burden and expense of individual prosecution of the complex litigation necessitated by

Defendants' wrongful conduct. Thus, it would be virtually impossible for many of the individual

members of the Class to obtain effective relief from Defendants' misconduct. Even if members

of the Class could sustain such individual litigation, it would not be preferable to a class action

because individual litigation would increase the delay and expense to all parties due to the

complex legal and factual controversies presented in this Complaint. By contrast, a class action

presents far fewer management difficulties and provides the benefits of single adjudication,

economies of scale, and comprehensive supervision by a single court. Economies of time, effort,

and expense will be fostered and uniformity of decisions will be ensured.

## CAUSE OF ACTION
### Violations of 47 U.S.C. § 227(b)
### (On behalf of Plaintiffs and the Class)

61.     Plaintiffs incorporates the foregoing allegations as if fully set forth herein.

62.     Defendants placed unwanted telephone calls to Plaintiffs' and the Class Members'

cellular telephone numbers without their prior express consent.

63.     These calls featured prerecorded voices.

64.     These calls were also placed using telephone dialing equipment that had the

capacity to store or produce telephone numbers to be called using a random or sequential number

generator, and/or to receive and store lists of phone numbers, and to dial such numbers, *en*

*masse*, without active human intervention.

65.     By placing telephone calls to Plaintiffs' and the Class members' cellular

telephone numbers, without prior express consent, and while utilizing automatic telephone

dialing equipment and/or artificial or prerecorded voices, Defendants violated 47 U.S.C. §

227(b)(1)(A)(iii).

23

66. As a result of Defendants' unlawful conduct, Plaintiffs and the Class received unwanted and intrusive telephone calls, and suffered invasions of privacy, violations of their statutory rights, loss of time, and actual damages in the forms of wear and tear on their telephone equipment; consumed battery life; diminished use, enjoyment, value, and utility of their cellular telephone plans; and the loss of any cellular minutes consumed by such calls.

67. Accordingly, under 47 U.S.C. § 227(b)(3)(B), Plaintiffs and the members of the Class are each entitled to, *inter alia*, a minimum of $500 in statutory damages for each of Defendants' violations of the TCPA.

68. Because Defendants' conduct was willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by Plaintiffs and the other members of the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, pray for the following relief:

1. An order certifying the Class as defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as Class Counsel;

2. An award of actual and statutory damages;

3. An injunction requiring Defendants and their agents to cease all unsolicited telephone calling activities, and otherwise protecting the interests of the Class;

4. An award of reasonable attorneys' fees and costs; and

5. Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,


**JEFFREY MOLITOR**, **LAURA C. DE LA CABADA, STEVE CLARKE, AND RUTH MAKI,** individually and on behalf of all others similarly situated,


Dated: June 20, 2016            By: /s/  Eve-Lynn J. Rapp_____
                                                One of Plaintiffs' Attorneys

                                                Rafey S. Balabanian
                                                rbalabanian@edelson.com
                                                Benjamin H. Richman
                                                brichman@edelson.com
                                                Eve-Lynn Rapp
                                                erapp@edelson.com
                                                EDELSON PC
                                                350 North LaSalle Street, Suite 1300
                                                Chicago, Illinois 60654
                                                Tel: 312.589.6370
                                                Fax: 312.589.6378

                                                Joseph I. Marchese*
                                                jmarchese@bursor.com
                                                Philip L. Fraietta*
                                                pfraietta@bursor.com
                                                BURSOR & FISHER, P.A.
                                                888 Seventh Avenue
                                                New York, New York 10019
                                                Tel: 646.837.7150
                                                Fax: 212.989.9163

                                                *Pro Hac Vice application forthcoming

                                                Attorneys for Plaintiffs and the Putative Class